Jenkins Towel Service, Inc., Appellant, *v.*
Fidelity-Philadelphia Trust Company.

Argued April 21, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and EAGEN, JJ.

*Samuel Kagle,* for appellant.

*Thomas M. Thistle,* with him *Ralph Earle, II,* and *Smyth, Straub & Thistle,* and *Morgan, Lewis & Bockius,* for appellees.

OPINION BY MR. JUSTICE BELL, June 3, 1960:

Plaintiffs filed a complaint in equity seeking (1) specific performance of an alleged agreement to sell real estate and (2) an injunction restraining the defendants from seeking a change in the zoning to permit the erection of a gasoline station. The lower Court sustained preliminary objections and entered an Order dismissing the amended complaint.

Fidelity-Philadelphia Trust Company owned, as trustee,* the properties in question. Plaintiff averred in its amended complaint:

"12. Since 1956 the financial condition of the trust of which said real estate was a part, which Fidelity administered, was in acute need of cash and income to carry out the trust purpose, and it was deemed neces-

---

* The name of the estate or the person for whom the Fidelity held the properties was not disclosed.

sary and practicable to sell said real estate as it did not produce sufficient income.

"13. As a consequence, on March 19, 1956, Fidelity offered said properties at public aution, but the properties were withdrawn because the bids were inadequate.

"14. Since March 1956 said properties were offered on the real estate market and plaintiff, Esso, and other parties separately carried on negotiations, and as a consequence, the sale price was progressively increased.

"15. During April 1959 Fidelity offered said real estate to plaintiff for $85,000.00 and plaintiff's counter-offer of $82,500.00 was declined.

"16. During June 1959 the financial conditions of said trust became so acute and the need of cash to carry out the trust purposes became so great that Fidelity and its co-trustee or trustees whose identity is presently unknown to plaintiff, decided and agreed to abandon further preliminary negotiations with the interested parties and to sell the properties to the party who submitted the highest acceptable cash bid in excess of $92,000.00.

"17. On June 18, 1959, pursuant to said decision to sell, as set forth in the preceding paragraph, defendant Fidelity, in order to give each and every prospective purchaser a fair and equal chance and in order to secure the highest and best price for the owner, asked for sealed bids."

Plaintiff then averred that the Fidelity submitted a written offer to plaintiff and others as per the following letter:

"June 18, 1959

"Jenkins Towel Service, Inc.

"Attention: Mr. James E. Mitchell, Vice President

"Dear Mr. Mitchell:

"We wish to acknowledge your letter of recent date submitting an offer for the purchase of the group of

properties situate and known as '241-47 North 11th Street, 1030-32 Vine Street, and 1018-22 Vine Street', Philadelphia, Pa.

"As you already know, several offers have been submitted for the purchase of these properties which offers are approximately of the same amount and on the same terms and conditions. The Fidelity-Philadelphia Trust Company is acting in a fiduciary capacity in the management of these properties and is, of course, obligated to recommend the offer which it believes most advantageous to its Estate.

"In order to give each and every prospect a fair and equal chance and in order to secure the highest and best price for the Estate which it represents it has been decided to ask for sealed bids from all interested parties. It is suggested, therefore, that you forward to this office on or before Wednesday, June 24, 1959, your highest offer for the properties. At that time the bids will be opened and an Agreement of Sale tendered to the highest acceptable bidder provided the offer is in excess of $92,000 cash, free and clear of any and all brokerage commissions. All offers must be on an all cash basis and must be accompanied by a check to the order of the Fidelity-Philadelphia Trust Company, Trustee, in the amount of at least 10% of the offer. The Agreement of Sale will provide for the equal division of all Realty Transfer Taxes between buyer and seller. The Agreement of sale shall also contain a provision that the Vendee or purchaser has not been interested in the property through any real estate broker or attorney and that no commission is therefore due by the Vendor to anyone. Further, that if any claim is filed for a commission by any broker or attorney, the Vendee or purchaser is to assume full responsibility therefor. The Trustees of course, reserve the right to approve or disapprove of any and all offers, or to withdraw the properties from the market.

"In submitting your bid please note on the envelope containing the bid and check 'Sealed bid—June 24, 1959' and direct the bid to the undersigned.

"If you desire any further information or if we can be of any assistance please do not hesitate to call upon us.

Very truly yours,
George Butterworth, Jr.
Assistant Vice President."

Plaintiff further averred that on June 24, 1959, plaintiff submitted a sealed bid for said properties in the sum of $95,600 cash, accompanied by a treasurer's check in the sum of $10,000; that when the bids were opened only plaintiff and Esso Standard Oil Company submitted a bid; that plaintiff and defendant each bid the sum of $95,600, but that the bid of plaintiff was unconditional in all respects and complied fully with all the requirements of the offer as set forth in Fidelity's letter, but the bid of Esso Standard Oil Company was conditional and qualified in that it stipulated that its offer to purchase was subject to approval of its home office in New York and also to the approval of zoning authorities to permit the use of these properties as a gasoline station in an area which was zoned "C" Commercial.

On July 3, 1959 plaintiff requested Fidelity to enter into an agreement of sale under and in accordance with the terms set forth in its letter of June 18, but on July 9, 1959 Fidelity refused to do so. Plaintiff further averred that on July 31, 1959 one of the defendants, Pottash, filed an application with the Zoning Bureau of Philadelphia for a permit to demolish existing buildings and to erect a modern gasoline station on the properties in question. The Plan attached to this application bears the following legend: "Esso Standard Oil Co., City Line Ave. and Esso Road, Bala-Cynwyd,

Pa." This application was denied by the Zoning Bureau, whereupon Pottash appealed to the Zoning Board of Adjustment. Plaintiff further averred that "said Pottash is acting as agent for Esso and that Esso is endeavoring to obtain the zoning permit to erect a gasoline station pursuant to an agreement between Esso and Fidelity (whereunder Fidelity will sell said real estate to Esso), all of which is in derogation of plaintiff's legal and equitable rights in the premises."

The rights of the parties depend upon the proper construction of Fidelity's letter of June 18, 1959. Plaintiff claims the letter was an offer, which it unconditionally accepted. Defendants claim that the letter was merely "preliminary negotiations" and "an invitation to bid."

Fidelity's letter of June 18 is ambiguous and therefore it must be interpreted most strongly against the Fidelity, which drew it: *Betterman v. American Stores Co.,* 367 Pa. 193, 80 A. 2d 66. In that case the Court said (pages 203-204):

". . . If, therefore, the contract, or any part of it, is susceptible of two reasonable constructions, 'It is an elementary proposition that a written contract should, in case of doubt, be interpreted against the party who has drawn it; 6 R.C.L. page 854, Sec. 242; White vs. Smith, 33 Pa. 186.' Hempfield Township School District vs. Cavalier, 309 Pa. 460, 463, 164 A. 602.

" '. . . "Contracts must receive a reasonable interpretation, according to the intention of the parties. . . . if that intention can be ascertained from their language." ' Brown vs. Raub, 357 Pa. 271, 287, 54 A. 2d 35.

" ' ". . . in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement": Slonaker v. P. G.

Publishing Co., 338 Pa. 292, 296, 13 A. 2d 48, 50, 51.'
Hindman v. Farren, 353 Pa. 33, 35, 44 A. 2d 241."

In *Smith-Faris Co. v. Jameson Hospital Association
et al.*, 313 Pa. 254, 169 Atl. 233, the Court said (page
260) : " 'The proper construction of a contract is not
dependent upon any name given it by the parties, or
upon any one provision, but upon the entire body of
the contract and its legal effect as a whole': 6 R.C.L.,
page 836, section 226."

Plaintiff's sealed bid of $95,600 was unequivocal,
unconditional, and in full compliance with all the
terms and conditions set forth by the Fidelity in its
letter-offer dated June 18, 1959. On the other hand the
bid of Esso Standard Oil Company was conditional
and qualified. Esso's bid was not an acceptance of the
offer made by Fidelity; on the contrary it was a re-
jection of this offer and a counter-offer. Restatement,
Contracts, §60, and particularly comment a; §27, Illus-
tration 3. It is clear that plaintiff was the only party
which accepted the Fidelity's offer.

If, as defendants contend, Fidelity's letter of June
18 was merely an invitation to prospective purchasers
who had been negotiating unsuccessfully for several
years to submit a higher bid or offer which it could
accept or reject in its sole and arbitrary discretion,
why did Fidelity ask for "sealed bids" from all inter-
ested parties on or before June 24, 1959, and further
state "at that time the bids will be opened and an
*Agreement of Sale tendered** to the highest acceptable
bidder, provided the offer is in excess of $92,000 cash,
free and clear of all brokerage commissions," and then
specify in detail the other provisions which were to
be incorporated in the agreement of sale? On its face,
and especially in the light of the prior negotiations,
the surrounding circumstances and the objects which

---

* Italics throughout, ours.

the parties apparently had in view, the contention of defendants that this was merely an invitation to bid, which Fidelity could reject in its unfettered discretion, is unreasonable.

In an attempt to support Fidelity's construction and position, defendants have overlooked not only the law as to the interpretation of a contract which must be considered in its entirety, but also the most important provision, viz. that after the bids are opened it will tender to the highest acceptable bidder** an agreement of sale, the details of which are set forth in Fidelity's letter of June 18.

Defendants rely upon the statement in Fidelity's letter that it was acting as fiduciary and was "obligated to recommend the offer which it believed most advantageous to its estate." This contention is devoid of merit. Plaintiff unconditionally and unqualifiedly accepted all the terms and conditions of Fidelity's offer, and no other party did; and there was no higher or more advantageous offer. Defendants also rely upon the following sentence—"The Trustees, of course, reserve the right to approve or disapprove of any and all offers, or to withdraw the properties from the market." This sentence standing alone is what creates a possible ambiguity. This sentence must be interpreted, we repeat, by considering the surrounding circumstances, the objects Fidelity apparently had in view, and the contract in its entirety, and if there is any ambiguity which is reasonably susceptible of two interpretations, the ambiguity must be resolved against the Fidelity which drew the letter-offer. So interpreted, we believe the sentence means that Fidelity can withdraw the properties from the market at any time before the opening of the sealed bids, and can approve or disapprove any offer which does not *fully* comply with all the

---

** There is no contention that plaintiff was not acceptable.

conditions set forth by the Fidelity, or which complies but adds unsatisfactory terms.

Appellee and the Court below rely upon *Hilliard Estate,* 383 Pa. 63, 117 A. 2d 728, where a corporate executor accepted a subsequent and higher bid. That case is clearly distinguishable. In that case the executor's letter stated "all offers are subject to the approval of the co-executors." (1) Appellant's offer was not accepted by the co-executors and (2) there was no subsequent or higher bid in the instant case. As the Court said (page 66) : "The circular letter, however, unequivocally stipulated that all offers were subject to the approval of the co-executors . . . Therefore the circular letter merely constituted an invitation to bid."

We are convinced that the letter of Fidelity Trust Company dated June 18, 1959, was an offer of sale of the properties in question by Fidelity, subject to the terms and conditions therein set forth and that the offer was duly and unconditionally accepted by plaintiff alone. The Court below therefore erred in sustaining the defendants' preliminary objections and in dismissing plaintiff's amended bill of complaint. If the defendants are unable to controvert the facts set forth in the amended complaint, the plaintiff should be awarded specific performance of the contract.

Decree reversed with a procedendo at the cost of the trust estate of which Fidelity-Philadelphia Trust Company is trustee or co-trustee.

----

DISSENTING OPINION BY MR. JUSTICE BENJAMIN R. JONES:

The crux of my disagreement with the majority of this Court lies in the interpretation of the letter of June 18, 1959 from Fidelity to Jenkins. The majority construes this letter as a firm *offer* on the part of

Fidelity to sell this real estate to the highest bidder, whereas I construe this letter as an *invitation for an offer* to be submitted to purchase this real estate.

Fidelity held title to this property as a fiduciary: such fact, known to Jenkins, required that in the disposal of such property Fidelity exercise a high degree of care: *Herbert Estate,* 356 Pa. 107, 110, 51 A. 2d 753. In recognition of its fiduciary duty, Fidelity warned Jenkins that, as a fiduciary, it was "obligated to *recommend* the offer which it believes most advantageous to its Estate". (Emphasis added).

Four different times the letter employs the words "offer" or "offers" to describe that which Jenkins is to submit. The letter requests the addressee to "forward your highest offer"; it states that all *"offers"* were to be made on a cash basis: it directs that a check should accompany the offer "in the amount of at least 10% of the *offer"*; lastly, Fidelity reserved the right to approve or disapprove of "any or all *offers"*.

The majority bases its interpretation of the letter as an "offer" on two facets of its language: first, the letter asks for "sealed bids" and, second, the letter states that "at that time [June 24, 1959] the bids will be opened and an Agreement of Sale tendered". A "sealed bid" is simply an "offer" or a "bid" submitted in such form that its contents are concealed until the time of opening, a cautionary measure which insures to bidders an equality of treatment at the hands of the person who invites such offers or bids. The mere fact that a "bid" is sealed does not determine whether the bid is an "offer" of "an acceptance or an offer". The employment of the word "sealed" adds no magic to the situation.

Had the letter stated an "Agreement of Sale [will be] tendered to the highest bidder" the majority view *might* be supportable, but the majority overlooks an

all-important word in the phrase actually employed, i.e., the word "acceptable". An Agreement of Sale was not to be tendered to "the *highest* bidder", but to "the *highest acceptable* bidder". The word "acceptable" certainly and clearly modifies the word "highest" and reveals a clear intent on the part of Fidelity that an agreement of sale will be tendered to the highest bidder *only if such bidder is "acceptable"*. This phrase does support not the majority, but my view that *Fidelity* reserved the right of rejection of any bid that was not *acceptable* to it.

Finally, Fidelity's letter expressly states: "The Trustees, of course, reserve the right to approve or disapprove of any or all offers, or to withdraw the properties from the market". The majority states that this "sentence means that Fidelity can withdraw the properties from the market at any time before the opening of the sealed bids, and can approve or disapprove any offer which does not *fully* comply with all the conditions set forth by Fidelity, or which complies but adds unsatisfactory terms". Such a construction is absolutely unjustified under the clear language employed by Fidelity. If a bid did not *fully* comply with the terms of the letter, or, if it complied, but added any terms, whether satisfactory or unsatisfactory, such a bid, even if called an "acceptance", would not constitute an acceptance to any offer contained in the letter. As to the interpretation by the majority that Fidelity's right to withdraw ceased at the time the sealed bids were opened, such a construction rewrites the language of the letter and imposes on Fidelity's part a condition judge-created and not Fidelity intended and expressed.

If the English language ever was effectively employed to express a fiduciary's reservation of the right to reject any and all bids it appears in this letter. Fundamental concepts inherent in the law of contracts

should not be lightly cast aside for the sake of expediency in the determination of a particular case. Instead of construing this letter *as written,* the majority, under the guise of a supposed ambiguity of language, now undertakes to rewrite the letter and to create a contract where no contract exists.

I, accordingly, dissent.